## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00651 (DLF)** |
| **v.** | : | |
| | : | |
| **EDWARD T. SPAIN, JR.,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Edward T. Spain, Jr. to 30 days' incarceration, 36 months' probation, 60 hours of community service, and $500 restitution.

### I.    Introduction

The defendant, Edward T. Spain, Jr. ("Spain"), participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than $2.7 million dollars in losses.[1]

On February 1, 2022, Spain pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building.  As explained

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol exceeded $2.7 million dollars. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

herein, a sentence of 30 days' incarceration is appropriate in this case because: (1) on January 3, and 4, 2021, Spain posted a statement on his Parler social media account that included the following: "PUBLIC SERVICE ANNOUNCEMENT: THE CIVIL WAR IN THE UNITED STATES IS EMMINENT!! ARM YOURSELVES WITH WEAPONS AND FIGHT FOR YOUR COUNTRY!!;" (2) on January 5, he drove with two friends from Oklahoma to Washington, D.C. to attend the January 6 "Stop the Steal" rally; (3) on January 6, Spain left his friends near the west front of the Capitol and told them not to go into the Capitol, while he went to the east front of the Capitol; (4) he saw a man trying to break into a ground floor window and a police officer being pepper-sprayed while on the East Plaza of the Capitol; (5) he entered the Capitol through the Rotunda doors without permission at approximately 2:50 p.m.; (6) he spent approximately 30 minutes in the Rotunda while police officers were trying to control the rioters there, was part of a group of rioters who were in a face-to-face confrontation with the police, and encouraged several other rioters to enter the Rotunda by pushing them in that direction before exiting through the Rotunda doors at approximately 3:21 p.m.; (7) on January 6, Spain posted a statement on his social media account that read: "I was there!! I will remember this day forever. What we did as Americans will live in Eternity!!;" (8) on January 7, he posted a statement on his social media account that stated, "I am speechless! Of the Events of yesterday. Angered by the sudden reversal on objections. Not following the Constitution??? We Americans are no longer living in a democracy, we are a banana republic. Its GO TIME! LOCK AND LOAD!! DO NOT LET GO OF YOUR GUNS!!;" and (9) during an pre-arrest interview with Federal Bureau of Investigation ("FBI") agents, Spain made the pretty ominous and unusual statement that he went inside the Capitol because he "wanted to see history being made and I wanted to see what kind of security that the Capitol had in place."

Even if he did not personally engage in violence or property destruction during the riot, before and after entering the Capitol on January 6, Spain warned the readers of Parler and other social media sites of a "civil war" and invited them to "arm" themselves "with weapons and [to] fight for our country." He also celebrated the violence and other activity that took place on that day by the rioters, including himself, to disrupt the Congressional certification of the 2020 Electoral College vote. Spain was an active-duty soldier in the United States Army for eight years and a member of the United States National Guard seven years. During an interview with FBI agents, Spain stated that his tasks in the military included riot control and site operations. His participation in the January 6 attack on the Capitol was not only against the advice he gave to his friends and his military duties, but at odds with his prior commitment to protect and defend the United States and the Constitution.

The Court must also consider that Spain's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed to delay the certification vote. The combination of Spain's January 3 and 4 social media posts forewarning of an imminent civil war, witnessing of violence and property destruction, being a part of a confrontation with police officers in the Rotunda, participation in a riot on January 6 that actually succeeded in halting the Congressional certification of the Electoral College vote, celebration of his participation in the riot, and call for social media site readers to arm themselves because the riot did not succeed in stopping the certification renders the recommended sentence both necessary and appropriate in this case.

## II.      Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the

U.S. Capitol. *See* ECF 16 (Statement of Offense), at 1-7. In doing so, however, the government in

no way intends or wishes to deemphasize the importance of acknowledging that each participant

in a riot is part of that riot. As Judge Chutkan recognized, "A mob isn't a mob without the numbers.

The people who were committing those violent acts did so because they had the safety of

numbers." *United States v. Matthew Mazzocco*, 21-CR-54 (TSC), ECF No. 32, p. 25. Judge

Lamberth similarly wrote,

> Some of the rioters—now defendants in criminal cases—directly contributed to this
> violence by assaulting members of law enforcement or by planning, preparing, and
> facilitating this violence. Others, like Little here, did not directly assault officers.
> But even Little and those who engaged in this "lesser" criminal conduct were an
> essential component to the harm. Law-enforcement officers were overwhelmed by
> the sheer swath of criminality. And those who engaged in violence that day were
> able to do so because they found safety in numbers.

*United States v. James Leslie Little*, 21-CR-315 (RCL), ECF No. 43, p. 2. From the most mundane

actions to the most violent, each rioter, including Spain, contributed directly and indirectly to the

violence and destruction of that day.

*Spain's Role in the January 6, 2021 Attack on the Capitol*

As Spain described in a pre-arrest interview and conversation with FBI agents, he knew

that President Trump planned a "Stop the Steal" rally in Washington, D.C. on January 6, 2021 and

that Congress intended to certify the Electoral College vote that same day. On January 5, 2021, he

drove with two friends from Oklahoma to Washington, D.C. On January 6, Spain and his friends

went directly to the Capitol, rather than attend the "Stop the Steal" rally near the White House. He

dropped off his two friends near the west front of the Capitol and told them not to go inside the

4

building. He parked his truck and went to the East Plaza of the Capitol.  At approximately 2:28 p.m., Spain took a photograph of himself on the East Plaza, see Image 1, and subsequently posted it to his Facebook page.

Image 1



An open-source video, available on YouTube, captures the breach of the Rotunda Doors at approximately 2:37 p.m., when Spain was present on the East Front of the Capitol Building, in close proximity to the Rotunda Doors.[2] From 00:38-01:47 in this video, rioters engage in a heaving maneuver designed to breach the doors while officers are cornered in the entranceway. As they continue to be yelled at, shoved, sprayed with chemical irritants, and struck with flag poles and other objects, the distressed officers bend over and cover their faces to protect themselves. Rioters steal a large riot shield from the officers. Images 2-4 are screenshots from

---

[2] This video is available at https://www.youtube.com/watch?app=desktop&v=MVullQb-Lec.

the video which capture some of the conduct that occurred there, including assaults on the officers cornered in the doorway (circled in blue):

Images 2-4







At approximately 2:50 p.m., Spain (identified with a red arrow or circle) entered the Capitol through the Rotunda doors without permission. See Images 5 and 6 and Video Exhibits 1 and 2.

Images 5 and 6





Spain stated that he entered the Capitol because he "wanted to witness what was happening." He also stated that he intentionally traveled to the Rotunda.

Images 7 through 10 are screenshots captured from surveillance cameras in the Rotunda, wherein Spain is circled in red. *See* Video Exhibits 3-6.

Images 7-9







Image 10



Image 11 is a photo of Spain in front of a statue and a police officer in the Rotunda. *See also* Video Exhibit 4.

Image 11



Image 12 is a screenshot from a video[3] that also captured Spain, at the front of a group of rioters confronting police in the Rotunda.

---

[3] https://www.gettyimages.com/detail/video/donald-trumpsupporters-storm-the-united-states-capitol-news-footage/1295318532 at timestamp 2:23.

Image 12



At approximately 3:21 p.m., Spain was captured by surveillance cameras as he exited the Capitol through the Rotunda doors. *See* Images 13 and 14 and Video Exhibits 7 and 8.

Image 13



Image 14



As revealed in Video Exhibit 7, as Spain was exiting the Capitol, he encouraged several other rioters to go into the Rotunda and pushed them in that direction.

### *Spain's Social Media Posts*

On January 3, and 4, 2021, Spain posted the following message to his Parler account:

PUBLIC SERVICE ANNOUNCEMENT: THE CIVIL WAR IN THE UNITED STATES IS EMMINENT!! THIS IS AN EMERGENCY ANNOUNCEMENT!! ARM YOURSELVES WITH WEAPONS AND FIGHT FOR YOUR COUNTRY!! LOCAL LAW ENFORCEMENT AGENCIES WITH COLLAPRSE EMERGENCY FIRST RESPONDERS WILL BE OVERWHELMEDSTAY TUNED TO YOUR LOCAL EMERGENCY BROADCAST NETWORK FOR FURTHER INFORMATION.

On January 6, 2021, Spain posted: "I was there!! I will remember this day forever. What we did as Americans will live in Eternity!!" The following day, on January 7, 2021, Spain posted:

I am speechless! Of the Events of yesterday. Angered by the sudden reversal on objections. Not following the Constitution??? We Americans are no longer living in a free democracy, we are banana republic. Its GO TIME! LOCK AND LOAD!! DO NOT LET GO OF YOUR GUNS!!

### *Spain's Interview*

On July 27, 2021, Spain voluntarily agreed to an interview with FBI agents prior to his arrest. During the interview, Spain stated that he drove to Washington, D.C. on January 5, 2021,

to be present on January 6 because he wanted to "witness history." He had witnessed posts on Facebook and media sites and, coupled with his military experience, believed that "something" was going to happen.

Spain stated that he was not associated with any groups planning to cause violence, but he believed that "one of the extremist groups like the Proud Boys or the Oath Keepers . . . they might do something . . and I think that's why I went. I wanted to see it happen." "I wanted to see history being made and I wanted to see what kind of security that the Capitol had in place."

Spain stated that he his friends arrived in the Washington, D.C. area the evening of January 5 and they came into Washington, D.C. to attend an evening rally.  On January 6, Spain intentionally missed the "Stop the Steal" rally and drove with his friends directly to the Capitol. Spain left his friends near the west front of the Capitol and told them "whatever happens don't go in that building." He went to the East Plaza, took a selfie on the Plaza, then entered the Capitol and proceeded to the Rotunda. He went to the Rotunda because he "wanted to see what was happening."

Spain advised that he had previously visited the Capitol between 1976 and 1979 and was familiar with the Rotunda, including the fact that there were cameras in the room. He intentionally chose to go to the Rotunda on January 6 because of his familiarity with the Capitol and the information he learned during that visit about what could happen if the Capitol were to be attacked. He was unable to recall whether he took any photographs while he was in the Capitol and was unable to locate any on his phone. He did reveal photographs that he took outside the Capitol.

While outside the Capitol, Spain recounted seeing a man trying to break a ground floor window and a police officer being pepper-sprayed. While inside the Capitol, he recounted witnessing rioters pushing police officers and climbing onto statues in the Rotunda. He opined that

"security was way too relaxed," but did not mention that he was a part of a group of rioters who were in a face-to-face confrontation with the police, See Image 9 and Video Exhibit XX.

Because he did not engage in violent or destructive behavior, Spain stated that he did not think he did anything wrong. He also acknowledged that he does not own any firearms, even though he posted on social media for members of the public to get their guns.

Although the agents did not mention their knowledge of Spain's social media posts during the interview, the only social media post that Spain acknowledged posting about his activities on January 6 was the selfie, Image 1, that he posted on Facebook.

### *Spain's Clothing and Admission*

On August 16, 2021, Spain brought the clothing (including, the jacket, shirt and hat) that he wore to the Capitol on January 6 to the FBI office in Tulsa, Oklahoma and gave them to the FBI case agent. See Image 15.

Image 15



He also presented agents with a signed written statement confessing to entering the United States

Capitol on January 6, as shown in Image 16. In the statement, Spain wrote:

> I Edward T. Spain Jr. was in Washington DC on January 6th. I did go inside the
> Capitol Building. I had no intention of entering the Capitol Building but did so after
> hearing that shots had been fired on the Senate floor. I did not vandalize anything.
> I had no intention of causing harm or to anyone or anything. I utilized poor
> judgement in doing so."

Image 16



*The Charges and Plea Agreement*

On October 5, 2021, Spain was charged by complaint with violating 18 U.S.C.

§§ 1752(a)(1), 641, and 40 U.S.C. §§ 5104(e)(2). On October 7, 2021, voluntarily appeared in the

district court in the Northern District of Oklahoma. On October 29, 2021, Spain was charged in a

four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C.

§§ 5104(e)(2)(D) and (G). On February 1, 2022, he pleaded guilty to Count Four of the

Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading,

14

Demonstrating, or Picketing in a Capitol Building. By plea agreement, Kramer agreed to pay $500 in restitution to the Architect of the Capitol.

### III.     Statutory Penalties

Spain now faces a sentencing for violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment, a fine of not more than $5,000, and a $10 special assessment. He must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 30 days' imprisonment.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at a defendant's individual conduct, this Court, in determining a fair and just sentence on this spectrum, should look to a spectrum of aggravating and mitigating factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Spain personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on his part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Spain from most other misdemeanor defendants.

Spain anticipated what would happen in Washington, D.C. and wanted to be there to "witness history." His statements on social media before the attack demonstrated his anticipation of violence and his encouragement that like-minded persons should prepare for violent confrontations before and after January 6. The fact that he did not bother to attend the "Stop the Steal" rally speaks to his anticipation that a momentous and tumultuous event was going to take place at the Capitol, rather than at the rally, and his interest in being a part of it. He told his friends not to go into the Capitol, likely because he knew such entry was illegal and perhaps that there would be violence. At the Capitol, Spain witnessed a rioter attempt to break into a window and police being confronted by rioters and he chose to enter the Capitol for a better experience. Indeed, after entering the Capitol he got that experience, which included being a part of a group of individuals who confronted police officers in the Rotunda. Moreover, after being in the Capitol, on January 6, and 7, Spain bragged that he was there and celebrated his involvement and that of other rioters. Finally, Spain expressed his anger for the result of the certification vote and told social media site readers, "Its GO TIME! LOCK AND LOAD!! DO NOT LET GO OF YOUR GUNS!! Under the circumstances, Spain's behavior and posts should not be ignored and deemed inconsequential.

While Spain quickly accepted responsibility for his conduct, this Court should view such expressions of remorse with a grain of salt. As several other sentencing proceedings for these defendants have shown, the expression of remorse can be an unreliable watermark in January 6 cases. As Judge Chutkan explained:

> And I take into account the government's statement and [defense counsel]'s statement that he accepted early responsibility. But [the defendant's] remorse—and I believe his remorse is sincere—[the defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he

realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.

*United States v. Matthew Carl Mazzocco*, 21-CR-54 (TSC), ECF No. 32, pp. 29-30. Judge

Lamberth expressed even more skeptical views:

> The Court often finds it difficult to ascertain the sincerity of these particular defendants' remorse. Many defendants appear sincere at sentencing, boasting of their purportedly deep shame, regret, and desire to change and be law-abiding citizens. But this Court is all too familiar with crocodile tears. Indeed, one day after being sentenced to probation, another January 6 defendant made statements in an interview that directly conflicted with the contrite statements that she made to the undersigned.

*United States v. James Leslie Little*, 21-CR-315 (RCL), ECF No. 43, pp. 3-4.

Accordingly, the nature and the circumstances of this offense render the government's recommended sentence of 30 days' imprisonment, three years' probation, and 60 hours of community service sufficient but not greater than necessary to reflect the seriousness of the instant offense, to promote deterrence, to protect the public from future crimes that may be committed by Spain, and to avoid unwarranted disparity.

### B. Spain's History and Characteristics

As set forth in the Presentence Investigation Report ("PSR"), Spain is a 56-year-old man with both a military and employment history. PSR ¶¶ 53-58. As Spain stated during an interview, he was tasked with engaging in riot control and site operations; he took advantage of his training and experience when he entered the Capitol on January 6. He also acquired skills in the military and private industry as a construction laborer, including welding. He is currently a forklift driver.

Spain's criminal history includes two 2010 convictions. He pled guilty to Driving While Intoxicated and was sentenced to 23 days in custody. PSR ¶ 29. He pled nolo contendere to Malicious Injury to Property and received a deferred sentence of three years. PSR ¶ 30.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss

during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to
> attack the Capitol to prevent our elected officials from both parties from performing
> their constitutional and statutory duty, democracy is in trouble. The damage that
> [the defendant] and others caused that day goes way beyond the several-hour delay
> in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven

months ago for the United States and our diplomats to convince other nations to pursue democracy.

It means that it will be harder for all of us to convince our children and our grandchildren that

democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v.*

*Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 24 ("What happened on that day was

nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of

an election as part of the transition of power from one administration to the next, something that

has happened with regularity over the history of this country. That mob was trying to overthrow

the government.") (statement of Judge Chutkan).

The gravity of these offenses demands deterrence. This was not a protest. *See United States*

*v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be

made defending what happened in the Capitol on January 6th as the exercise of First Amendment

rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—

especially those who intend to improperly influence the democratic process—that their actions

will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Spain's actions – before, during and after the riot – demonstrate the need for specific

deterrence. His social media posts and interest in violence are very disturbing, particularly given

his military training and experience. He demonstrated no real recognition of wrongdoing until August 16, 2021, when he brought the clothing that he wore on January 6 to the FBI and provided a written statement in which he acknowledged that he should not have entered the Capitol.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[5] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[6] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge

---

[5] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[6]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

Lamberth); *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have made meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Spain has pleaded guilty to Count Four of the Information, charging him with parading, demonstrating and picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.   And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other

relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentences imposed in similar misdemeanor cases involving the use of social media and celebration of the riot.

James Little pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building.  Prior to January 6, Little uploaded a video titled, "We Won't Beat Them Next Time! There Won't Be A Next Time! It's Now Or Never!" to a YouTube channel he maintained. In that video, Little threatened civil war and gun violence against political opponents of the former President if the Supreme Court did not intervene  on the former President's behalf. On January 6, Little entered the Capitol, went to the Senate Gallery,

celebrated being there with other rioters, and sent a text boasting about being in the Capitol. On January 13, 2021, he again referenced the commencement of a civil war. Judge Lamberth imposed a sentence of 60 days' imprisonment and 36 months' probation. 21-cr-00315 (RCL).

As this Court is aware, Verden Andrew Nalley pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1), Entering or Remaining in a Restricted Building or Grounds, a Class A misdemeanor. Nalley entered the Capitol on January 6 and walked around for 30 to 40 minutes. After January 6, his social media posts revealed a lack of remorse for his actions.  He actively spread false information, downplaying the violence that occurred on January 6 and threatened to "be back with guns in two weeks if [the election results were] not fixed." The government requested a sentence of 14 days imprisonment and 36 months' probation. This Court imposed a sentence of 24 months' probation. 21-cr-00116 (DLF)

Kevin Daniel Loftus pleaded guilty to violating 40 U.S.C. § 5014(e)(2)(G). Loftus entered the Capitol without permission on January 6. On January 7, Loftus wrote on his Facebook account that he was wanted by the FBI in relation to his presence in the Capitol on January 6. He also wrote, "That is right folks some of us are in it to win it." Like Spain, Loftus also had been an active-duty soldier with the United States Army for many years. The government requested a sentence of 30 days' imprisonment and 36 months' probation. This Court imposed a sentence of 36 months' probation. 21-cr-00081 (DLF),

In this case, the government submits that a sentence of 30 days' imprisonment would not create an "unwarranted disparity" with the sentences imposed in those cases because of the aggravating factors in this case.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is

24

"firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.  The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense. *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing a split sentence).

### A.  A sentence imposed for a petty offense may include both incarceration and probation.

#### 1.  *Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today.  *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal

sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment).  Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[7] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences."  Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided."  18 U.S.C. § 3551(a).  Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D."  18 U.S.C. § 3551(b).[8] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment."  *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation."  As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense."  Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D.

---

[7] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10).  *See* Part II *infra*.

[8] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence."  18 U.S.C. § 3551(b).

Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3).   In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense."  H.R. Rep. 102-405, at 167 (1991).  Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language.  *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report).  In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

### 2. *Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases.  *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).  In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404,

at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL 768685, at *4.  But that limitation "does not extend" to a defendant sentenced to a petty offense.  *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation.  *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison.  *Id.* at 808.  In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3)

"[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL

768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart

from a case involving a petty offense.  *Id.*  This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls.  *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329.  Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail."  *Id.* at 185.  "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers."  *Id.*  Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning.  When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence.  Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3).  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two

offenses, at least one of which is a petty offense.  For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough.  *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).  Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation).  Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation).  No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.  Comeau pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine.  *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

### B. A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.

#### 1. *Relevant background*

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement

that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*[9]

### A.  Analysis

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time."  18 U.S.C. § 3653(b)(10).  Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix

---

[9] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[10]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In any event, the government does not advocate a sentence that includes a imprisonment as a term of probation in Spain's case given the requested 30-day imprisonment sentence.

## VI.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Spain to 30 days' imprisonment, 36 months' probation, 60 hours' community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future

---

[10] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY
DC BAR NO. 481052

By:     */s/ ANITA EVE*

ANITA EVE
PA Bar No. 45519
Assistant United States Attorney (Detailee)
U.S. Attorney's Office
555 4th Street, N.W., Room 5840
Washington, D.C.  20530
Anita.eve@usdoj.gov
(215) 764-2177

Exhibit and Attachment List

Videos:

1.      Exhibit 1 – Rotunda Door Interior at approximately 2:51 p.m. (entry)
2.      Exhibit 2 – Rotunda Door Interior at approximately 2:52 p.m. (entry)
3.      Exhibit 3 – Rotunda North at approximately 2:53 p.m.
4.      Exhibit 4 – Rotunda South at approximately 2:54 p.m.
5.      Exhibit 5 – Rotunda North at approximately 3:02 p.m.
6.      Exhibit 6 – Rotunda North at approximately 3:05 p.m.
7.      Exhibit 7 – Rotunda Door Interior at approximately 3:21 p.m.
8.      Exhibit 8 – Rotunda Door Interior at approximately 3:21 p.m.

*Note that the 8 videos will be provided via electronic communication to the Court and defense counsel via USAfx.*

*Note that the government does not object to the public release of any of the above videos.*

Attachments:

1.      Table 1 -Table of sentencing decisions