**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No. 1:21-cr-000651(DLF)** |
| **EDWARD SPAIN, JR.** | : | |
| | : | |
| **Defendant.** | : | |

## <u>DEFENDANT'S SENTENCING MEMORANDUM</u>

The defendant, Mr. Spain, through his attorney, Kira Anne West, pursuant to Federal Rule of Criminal Procedure 32 and 18 U.S.C. Section 3553(a), submits this memorandum to aid the Court at sentencing and hereby notifies the Court that he has received and reviewed the Presentence Report ("PSR") prepared in this case. After carefully reviewing the PSR with Mr. Spain, he has no objections. Mr. Spain requests that this Honorable Court impose a sentence of 12 months probation to account for:

1.      His lack of need for incarceration,

2.      His instant and sincere remorse,

3.      His long trip to and from D.C. for initial appearance,

4.      His lack of preparation or planning prior to January 6, 2021 to be part of the Capitol breach, and

5.      His peaceful, non-destructive and non-violent behavior that day both outside and inside the Capitol building.

1

Mr. Spain comes before the Court having plead guilty  to count 4 of the Information  filed  charging him with a violation of Title 40 U.S.C. §5104(e)(2)(G), a  "petty offense," as defined by 18 U.S.C. § 3559(a)(7). The United States Sentencing Guidelines (Guidelines) do not apply to class B misdemeanors. *See* U.S.S.G. §1B1.9.

A sentence of one year of probation is a reasonable  sentence that is "sufficient, but not greater than necessary" to address the sentencing factors and goals set forth in Title 18 U.S.C. § 3553(a).  Under the facts of this case, such a sentence will protect the public, provide just punishment, and afford adequate deterrence.

## 1. BACKGROUND

### A.  Media coverage of The Black Lives Matter protests of 2020 and Trump denouncing the  2020 election

The summer of 2020 was a violent one for major cities across the United States, in large part, due to the protests of Black Lives Matter (hereinafter "BLM"). After several months of being couped up because of Covid-19, people took to the streets to protest the horrendous murder of George Floyd. Unfortunately, especially in D.C., these protests turned violent.  These protests were widely televised on the nightly news and other media outlets as a necessary process for vocal opposition to systemic racism and the only way  racial justice could be effectuated.  Mr. Spain

watched from his home in Oklahoma  and on the internet as hundreds of businesses across the nation were destroyed over a period of weeks, several people were injured, and nearly two billion dollars of damage was done by rioters nationwide.    https://www.washingtonpost.com/local/dc-braces-for-third-day-of-protests-and-clashes-over-death-of-george-floyd/2020/05/31/589471a4-a33b-11ea-b473-04905b1af82b_story.html ;  https://nypost.com/2020/09/16/riots-following-george-floyds-death-could-cost-up-to-2b/.   Soon after this, Joe Biden was elected President. Many Americans, including Mr. Spain, believed that the election was stolen from President Trump.  This Court can only understand why Mr. Spain came from Oklahoma to D.C. when taking into account these two pivotal events in our nation's history. While consumption of media news is no excuse for behavior, it does demonstrate the powerful impact news stories, fake or real, have on the citizens of this country.  The media sets the tenor for how people feel about their rights and freedoms and can also plant notions of discontent or even outrage.  After months of watching our major cities burn, many people became convinced that vocal displays of outrage in the form of protesting was the only way to make their voices heard.  Additionally, because it was reported that very few people were being prosecuted for their criminal behavior while violently protesting, (especially in the District of Columbia) which was replayed over and over again on the nightly news, the media helped reinforce the notion that there would be little to no

consequences for protestor

actions. https://www.mauinews.com/opinion/columns/2021/07/heres-why-most-arrested-rioters-will-not-be-prosecuted/;

https://www.usatoday.com/story/news/2020/06/15/criminals-used-george-floyd-protests-cover-looting-police-say/5324881002/.   Here, in D.C., although hundreds, if not thousands, committed property crimes such as painting  federal statues and burning and breaking into private businesses in town, the number of prosecutions was negligible. https://www.nytimes.com/2020/05/31/us/politics/washington-dc-george-floyd-protests.html.   Tucker Carlson and other conservative TV show hosts noted this on their nightly news casts.

*https://www.foxnews.com/opinion/tucker-carlson-the-riots-are-not-about-george-floyd-or-racial-justice-theyre-about-trump-and-seizing-power*.

Mr. Spain, like millions of other Americans, ate up the media coverage of these events in the Summer of 2020.   He saw the media label destructive and violent riots as "mostly peaceful" protests and the protestors praised on national media outlets for their strongly held beliefs.   He was unemployed at the time.   And while most of the BLM protests in the summer of 2020 were, in fact, peaceful, a report studying these protests found a large number of Americans believed they were not.   The report suggested that the "disparity stems from political

orientation and biased media framing… such as disproportionate coverage of

violent demonstrations." https://time.com/5886348/report-peaceful-protests/.



Image obtained from video clip at https://thehill.com/homenews/media/513902-
cnn-ridiculed-for-fiery-but-mostly-peaceful-caption-with-video-of-burning.

      Mr. Spain had limited life experiences to inform what he saw happening in

our nation. He had never attended a protest before.  He decided  along with some

friends to come to D.C. to  hear President Trump speak.  He did not suit up for

combat.  He did not obscure his face.  He was not armed.  He did not yell at

anyone. He wore street clothes and his army cap.  He committed no violent actions

in his trip to the Capitol.  He did not destroy anything. His only desire was to see

his President. Unfortunately, going inside the Capitol was not part of his plan and he now stands before the Court after admitting to the Court at his plea hearing that he knew going into the Capitol that day was wrong.

### 2. **THE TRIP TO THE CAPITOL AND JANUARY 6, 2021**

#### A. **Mr. Spain's trip to D.C. and his walk to the Capitol**

Mr. Spain believed that he should show his support for the President by attending his rally scheduled for January 6, 2021, at the Ellipse on the Mall. He had no idea about the procedural actions for the vote that day at the Capitol. He just wanted to go see President Trump speak.

At the time, Mr. Spain was unemployed and living with his son, and like hundreds of thousands of other Americans, was suffering emotionally and economically during the pandemic. At no time did he ever think he was going to the Capitol, let alone inside the Capitol. Not until President Trump's speech did he have any intention of going anywhere other than the Ellipse area, and not being from the area had no real sense of where things were in relation to each other. As the day unfolded, he never planned or envisioned entering the U.S. Capitol. That is, not until President Trump invited everyone to march to the Capitol. Mr. Spain followed the large crowd there that day with no intention of doing anything. Now, after seeing what really happened that day by watching film on numerous

platforms, Mr. Spain is ashamed of the fact that he allowed himself to be swept up in the moment.

### B. Mr. Spain's activities inside and outside the Capitol.

For some time, police were able to fend off the crowd, but as we now know, the crowd overwhelmed the few, unprepared police.[1] Officers were able to hold off the excited crowd for approximately an hour, but at 2:13 p.m., the Capitol was breached through a broken window adjacent to the Senate Wing Doors, located on the Northwest side of the building. This breach spurred the evacuation of members of Congress and the Vice President.   More than 30 minutes later, the Senate Wing Doors were penetrated by the crowd, pushing Capitol Police officers back into the inside corridor as they tried to prevent further intrusion.

Mr. Spain was not in this first wave of hundreds of protesters.  He could not see what was transpiring inside the Capitol.  He entered through the Rotunda doors (also known as the Columbus door) on the east side of the Capitol.   These doors were wide open and people were entering and exiting at will while officers stood to the side.  No one restricted his entry and the officers appeared to be acting merely as crowd control so that the doors did not get jammed up.  People were conversing

---

[1] *See* Dmitiy Khavin, et al., Day of Rage: An In-Depth Look at How a Mob Stormed the Capitol, The New York Times (June 30, 2021), available at https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trumpsupporters.html; see also Shelly Tan, et al., How one of America's ugliest days unraveled inside and outside the Capitol, The Washington Post (Jan. 9, 2021), available at https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.

with the officers and the flow of traffic in and out continued.    From this side of

the Capitol Spain could not see the violence or fighting at the west terrace tunnel

nor could he see the broken windows of the breach of the Senate wing doors.

He had no idea of the violence in other parts of the Capitol. In fact, he had

been so far behind the first people in that he had no idea how the door was opened

or who opened it.  He was a follower of the crowd, not a leader.   The confusion at

this point lies between conflating *our epistemic access* of the full scope of events

in their entirety with *Mr. Spain's knowledge and intention* as the day unfolded.

That is, though many others were violent leaders of the mob, pushing officers,

directing people to act with violence, and conducting violence themselves etc., Mr.

Spain, a combat veteran, was not violent nor did he intend to be so despite the

actions of the others.

## C. Hindsight is 20/20.

Now, in retrospect, Mr. Spain wishes he'd never come to D.C. at all, which

is terribly sad because D.C. is a place all Americans should see and experience.

He never imagined going inside the Capitol and certainly never thought that

violence would follow.   Importantly, Mr. Spain did not have any intention of

stopping the vote.  Indeed, his aimless following of the crowd through the Capitol

that day is evidence of his lack of intent to do something in the Capitol that day,

his lack of understanding where he was in the Capitol, and his herd mentality,

rather than a desire to execute a plan to stop the vote that was taking place in the Senate.

Mr. Spain's only intention that day was to see the president.   There is no evidence produced by the government or otherwise that he had any intention to stop the vote, that he went to the Capitol with the express purpose of stopping the vote, that he even knew where the vote even took place within the Capitol that day, and that others were there to stop it. In fact, he had no idea where he was while he was in the Capitol and to this day could not find his way around if given the opportunity.  He and his friends were respectful while there. They were in the building a very short time, about 20 minutes.

### D. <u>The Charges and the arrest of Mr. Spain</u>

On  October 5th, 2021, a  sealed criminal complaint was filed in U.S. District Court for the District of Columbia charging him with four misdemeanor offenses related to his conduct on January 6. *See* ECF No. 1.  He appeared in Oklahoma before a Magistrate Judge and was told by the Magistrate Judge, the probation officer, the prosecutor and/or  the assistant federal public defender that he needed to appear for his initial appearance in Washington, D.C., in person within 48 hours. In a panic, Mr. Spain dropped everything, ran down to the Greyhound bus station, bought a bus ticket to D.C. and spent the next 31 hours on a bus traveling to Union Station in D.C.  He then barely made his initial

appearance on time  in the District of Columbia  on October 12, 2021, and, again, was released on personal recognizance with conditions. *See* ECF No. 5. After that, he went back to Union Station, bought another one way ticket back to Oklahoma, and settled in for the 31 hour bus ride.  He later entered a plea of guilty  to  count four of the information on February 1, 2022 via video conference before this Honorable Court. *See* ECF # 15.  From start to finish, pretty much record speed for entry of guilt.  The government delayed getting discovery to Mr. Spain or he would have plead guilty even sooner.    He has been completely compliant while on pretrial release.

## II.  LEGAL STANDARD

Section 3553 of Title 18 of the United States Code enumerates certain factors a district court is to consider when sentencing a defendant who has been convicted of a federal offense.   Primarily, the court shall consider the nature and circumstances of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1). The court shall also consider the need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, and provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide defendant with needed educational or vocational training, medical care, or other correctional treatment in

the most effective manner. *Id.* at § 3553(a)(2)(A-D).  Section 3553(a) further sets

forth the factors that the Court must consider in fulfilling this provision:

1.   The nature and circumstances of the offense and the history and characteristics of the defendant;

2.   The need for the sentence imposed;

3.   The kinds of sentences available;

4.   The kinds of sentence and the sentencing range…;

5.    Any pertinent policy statements issued by the Sentencing Commission;

6.   The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and

7.    The need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1-7).

## III.  FACTORS CONSIDERED PURSUANT TO 18 U.S.C. §3553(a)

At sentencing, a district court must impose a sentence that is "sufficient, but

not greater than necessary" in light of the factors identified in §3553(a).    *United*

*States v. Mendoza-Mendoza*,  597 F.3d 212, 216 (4th Cir. 2010), *citing Kimbrough*

*v. United States*, 552 U.S. 85, 111 (2007)(quoting §3553(a)).

### A. Nature & circumstances of the Offense & the History and Characteristics of Mr. Spain

 Mr. Spain, a combat veteran, walked freely into the Capitol and was

impressed by the grandeur of the building.  He entered through the Rotunda doors

past numerous police officers who did nothing to stop him. He had never been to

the Capitol before.  Compared to many other class B misdemeanor cases that have

been filed in this Court, Mr. Spain's conduct is at the bottom of the scale.  First, the

defense is not aware of any evidence that defendant's entry into the Capitol was preplanned or coordinated with anyone else, including any extremist or organized groups. His intention was to see President Trump and that did not include going into the Capitol.  Second, the defense is not aware of any evidence that the Defendant incited others to commit acts of violence or destruction. Third, the defense is not aware of any evidence that he engaged in any violence or questionable conduct towards law enforcement.  When Mr. Spain thought it was time to leave the building, he immediately made efforts to get out.  He didn't have to be asked  and he didn't delay or try to avoid detection. Fourth, the defense is not aware of any evidence that he destroyed or stole any property from the Capitol. Fifth, based on the Government's investigation, it appears that he remained in the Capitol building for a very limited period of time.  The defense is not aware of any evidence that he entered any rooms or offices in the Capitol,  or any personal space or the Senate or House Chamber.

By the time Mr. Spain arrived at the U.S. Capitol,  well after  2:00 p.m., the barriers that had been erected along the perimeter of the building were no longer present. He met no resistance in his walk to and inside the Capitol. At the time,  he didn't dream he'd be charged for going into the Capitol.  After seeing the video footage showing protestors beating police officers, spraying gas in their faces, screaming obscenities, and destroying property, it made him  cringe.  He is left

with deep regret, fear, shame, and remorse. Mr. Spain was able to hear on the police radios that someone had been shot, and he heard that it was a veteran. Being a veteran himself, he felt he should go in and be of assistance.

The government concedes that he committed no violent acts and destroyed no property. His actions within the Capitol have been tracked on the CCTV footage and this demonstrates that while unlawfully present in the Capitol, he did not destroy property, steal property, commit violent acts, or encourage others to do so. He entered and exited through doors. And when he spoke to police officers, it was non-confrontational and respectful, even grateful.   Importantly, when he entered the Capitol, there were no police officers telling him not to come in.  Once he realized  he should leave, he did. His time in the Capitol was approximately 20 minutes.

To his credit, he  voluntarily agreed to talk to the FBI before he was charged and acknowledged his misconduct immediately by answering pointed questions by the FBI agents, expressed  full contrition, and voluntarily gave them the hat he'd worn to the Capitol that day. Then, he went back to the FBI office some days later and took with him a bag of the clothing he wore to the event. He even gave them a written statement when interviewed on July 27, 2021, wherein he admitted his conduct, stating "I did not vandalize anything. I had no intent of causing harm or to anyone or anything. I utilized poor judgment in doing so." *See* ECF #1, p. 7. (The

picture in the criminal complaint captioned photo 4 is not Mr. Spain. The FBI made a mistake).  To make their job even easier, Mr. Spain gave the FBI agent the code to his phone so they could easily download the contents.

This has been a long road for Mr. Spain and his family.  He pled guilty at an early stage in the proceedings thus saving valuable judicial resources. It is of utmost importance to Mr. Spain that this Court understand that he is incredibly remorseful for his actions on January 6, 2021. There is no doubt that, as he expressed when interviewed by law enforcement, he wishes he had never come to Washington, D.C. on that day.  None of this will be erased from his memory or the internet. It's there forever.  He has fully accepted responsibility for his bad judgement in entering the Capitol building by pleading guilty in what can be described as the "first wave" of defendants that pled guilty.  He has been the subject of a number of media accounts lumping him with others that were there on January 6, 2021 for violent purposes. His personal character and reputation will forever be tarnished.  Still, he has had limited trouble with the law and continues to show remorse and sincere regret for getting involved with President Trump's call to the Capitol that day.

Mr. Spain does not seek to minimize the harm caused by his behavior by the explanations in this sentence memo.  He did make  a few social media posts. Those posts did not condone violence although they did mention firearms. After he realized that there was a great deal of violence, he stopped posting and his

14

Facebook account was shut down by Facebook. Nonetheless, in determining what punishment is warranted, this Court should not lose sight that he did no harm, intended no harm, and regrets that he was even there.  Most telling about Mr. Spain is despite all he has been through, he found a good job and he is working full time. He has the support of his family and friends.  He served our country for 14 years. He was honorably discharged. He was completely honest with the  FBI agents that interviewed him. His story was confirmed by two other witnesses subsequently interviewed by the FBI.  He currently suffers from  pulmonary neuropathy and PTSD, among other ailments. *See* PSR, paragraph 48.  He could see a doctor at the VA Hospital, has chosen not to, but his lawyer is trying to convince him otherwise. His law abiding recent past and his post arrest behavior show that he is capable of being a productive citizen and the Court can rely on that as a basis to sentence him to a term of probation considering the 3553 factors.

The defense does not discount the posts that Mr. Spain made on social media.

## B. Need for the Sentence imposed

### 1. General deterrence – 18 U.S.C. § 3553(a)(2)(B) – to adequately deter others from criminal conduct

The purposes of sentencing include punishment, rehabilitation, general deterrence, specific deterrence, and incapacitation. In this case, there appears to be no need for incapacitation, specific deterrence or rehabilitation.  The public will be

adequately deterred by the sentences meted out against those who perpetrated the

violence and mayhem at the Capitol and the negative publicity and collateral

consequences attendant to even a misdemeanor conviction for those involved.

Those who would not be deterred by these consequences are likely not deterrable.

And, a sentence that leaves a person impoverished when other reasonable

alternatives exist would not promote respect for the law. Indeed, unnecessarily

harsh sentences imposed upon those who were less culpable will not encourage

respect for the law or promote just punishment, but are likely to  be

counterproductive, and labeled as political posturing.  A sentence of  probation

does constitute punishment  and  it will deter others as one's liberty interests are

curtailed by travel restrictions, reporting obligations, and limitations on one's

personal freedoms. The National Institute of Justice, Department of Justice, issued

a summary of the current state of empirical research stating that "prison sentences

are unlikely to deter future crime," and "increasing the severity of punishment does

little to deter crime."  U.S. Dep't of Justice, Office of Justice Programs, Nat'l Inst.

of Justice, *Five Things to Know About Deterrence* (July 2014) (relying on Daniel

S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Justice in America

199 (2013)), available at https://ncjrs.gov/pdffiles1/njj/247350.pdf.

   **2.  Specific deterrence – 18 U.S.C. § 3553(a)(2)(C) – to protect the public
      from further crimes of the defendant**

Mr. Spain's likelihood of recidivism is very low. He has expressed genuine remorse and contrition, has cooperated fully with law enforcement,  turned over evidence voluntarily, and  accepted the first plea offer tendered with no hesitation. His acceptance of responsibility was complete and without reservation.  Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006)" Three National Academy of Science panels… reached that conclusion, as has every major survey of evidence." *Id*.; *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and Sentence Severity: An Analysis of Recent Research (1999),* summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European Countries. *Id*. at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates…were not sufficient to achieve statistical significance." *Id*. at 2. The report concluded that the "studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id*. at 1. Given Mr. Spain's

17

current age and other issues consistent with what is mentioned above, the likelihood of Mr. Spain ever re-offending is as close to zero as one might come. A punishment of any jail time in this case is going to have the exact opposite effect than what is in the interest of justice. He would lose his job if given home detention. The alternatives to incarceration make financial sense, conserve bed space for individuals from which society would need greater protection and would serve the ends of justice. Mr. Spain urges the Court impose a sentence of one year probation in this case in light of his significant cooperation and honesty, his sincere and complete remorse, his early and consistent acceptance of responsibility, and the lack of a need to further deter him.

### C.  The kinds of sentences available

The sentencing guidelines do not apply in this case. If this Court were to adopt the government's recommendation, as opposed to that of the Probation Office, it would result in sentencing disparity with other individuals who were similarly charged and behaved similarly. *See infra*.[2]

Mr. Spain asks that the Court adopt the recommendation of the U.S. Probation Office and impose a sentence of probation, but only a sentence of 12 months.

---

[2] This does not include every case, just a sampling.

Imposition of a fine is discretionary, and, defendant respectfully submits, should not be ordered in this case.  Defendant's financial condition is such that she cannot pay any significant fine.  *See* U.S.S.G. **§ 5E1.2(a)** (fine not recommended if defendant unable to pay).

## D. The need to avoid unwarranted sentence disparities

If this Court were to impose a sentence greater than a probationary term, community service, and/or restitution, it would create an unwarranted sentencing disparity compared to similar cases that have already gone to sentencing in this Court.  The following cases are a sampling where a misdemeanor was charged and pled to and resulted in no incarceration:

**\*\***United States v. Anna Morgan-Lloyd,* 21-cr-00164 (RCL) (Jun. 28, 2021) (sentenced to probation);
**\*\***United States v. Danielle Doyle*, 21-cr-00324 (TNM)(Oct. 1, 2021) (sentenced to probation even though she entered through a broken window and yelled at police officers);
**\*\***United States v. Valerie Ehrke*, 21-cr-00097 (PLF) (Sept. 17, 2021) (sentenced to probation);
**\*\***United States v. Jessica Bustle and Joshua Bustle,* 21-cr-00238 (TFH), ECF Nos. 42 & 44 (sentenced to supervised release with home confinement even though Ms. Bustle 1) posted on social media that Mike Pence was a traitor, 2) denied media accounts of violence were accurate, minimized the conduct of all of the rioters, 3) called for a revolution even after the events of January 6, 4) encouraged the rioters to be proud of their actions, and 5) minimized the impact of that day on lawmakers and democracy. *See United States v. Jessica and Joshua Bustle*, 21-00238 (TFH). Judge Hogan imposed a probationary sentence with a short period of home confinement for Ms. Bustle and an even shorter period of home confinement for Mr. Bustle. The government recommended probation in this case.
**\*\***United States v. Andrew Bennett,* Crim. No. 21-227 (JEB)(sentenced to three months home confinement and two years probation). According to the government, who recommended probation with a short term of home confinement, Mr. Bennett

espoused conspiracy theories about the election, was an admirer, albeit not a
member of the Proud Boys, and boasted about his conduct. According to the
government, Mr. Bennett did not come to the rally in D.C. on a whim, but rather
planned it for months. He posted numerous times about conspiracy theories and a
fraudulent election. On January 4, 2021, he posted to his Facebook page, "You
better be ready chaos is coming and I will be in DC on 1/6/2021 fighting for my
freedom!". On January 6, according to the government, Bennet began
livestreaming video to his Facebook page from outside the Capitol as early as 1:00
p.m. He was in the middle of the growing crowd on the West Front of the Capitol,
where some taunted police officers and sporadically threw objects at them. The
government alleges that someone near Bennett exhorted others to "move forward"
and that Bennett yelled at a police officer. Bennett also filmed assaults on the
police officers and continued to livestream events inside the building.

None of this is to suggest that Mr. Bennett should have received a sentence

of incarceration, only to suggest that the distinctions the government draws are

hard to justify. There is nothing materially different about Mr. Spain or his conduct

that would justify a sentence of incarceration and such disparate treatment. Other

judges have sentenced some January 6 misdemeanor cases to incarceration, but the

nature and circumstances of those offenses, as well as the history and

characteristics of the defendants in those cases, can be distinguished.

In *United States v. Derek Jancart and Erik Rau*, 21-cr-00467, the Honorable

Judge Boasberg sentenced both defendants to 45 days of incarceration. However,

in that case, unlike Mr. Spain's, the prosecutors asked for four (4) months of

incarceration for each defendant, citing that the men came to D.C. with gloves, a

gas mask, and two-way radios. *Id.* Additionally, Mr. Jancart posted a video on

Facebook during January 6, where he is heard laughing at police while Mr. Rau

20

screamed, "We have you surrounded!" Additionally, Mr. Rau, unlike Mr. Spain, was on probation at the time of his offense on January 6 for domestic violence. Additionally, Judge Chutkan recently sentenced another January 6 defendant to 45 days of incarceration in *United States v. Matthew Mazzocco*, 21-cr-00054 (TSC)(October 4, 2021). However, Mr. Mazzocco blamed the violence that day on Antifa, deleted his social media accounts in an effort to obscure his actions, and refused to give law enforcement access to the body-worn camera he wore that day, claiming that he did not know where it was. See https://www.washingtonpost.com/dc-md-va/2021/10/04/capitol-riot-jail-deter-mazzocco/ In *United States. v. Reeder*, 21 CR 166(TFH), Judge Hogan sentenced Mr. Reeder to 90 days incarceration because he bragged on social media about having engaged in battles with the police inside the Capitol, showed no remorse or contrition, claimed he had no idea he could not be in the Capitol despite being tear-gassed, recorded attacks on police officers inside the Capitol, entered a second time *by forcing himself past police officers who were trying to clear the Capitol*, posted videos bragging about his actions and deleted social media accounts, and most importantly, put his hands on a police officer. Even after pleading guilty, according to the government, he portrayed himself as an innocent victim of circumstances. *Cf: United States v. Glenn Croy*, 21-cr-162(BAH) defendant sentenced to 36 months probation, 14 days in a ½ way house and 90 days home detention. Here, Mr. Croy entered the Capitol not once but

twice, engaged in yelling at police officers and was situated in the Capitol in such a way to breach police lines at critical junctures.

And this Honorable Court sentenced Brittiany Dillon, 21 CR 360(DLF), to 60 days home detention and 3 years' probation but she was much different from Mr. Spain as this Court knows: she was not remorseful and encouraged violence. This Court also sentenced Kevin Daniel Loftus , 21 CR 81 (DLF) to 3 years' probation. This Court also sentenced Andrew Williams in Crim. No. 21-045 (DLF) to a two year term of probation. Further, this Court sentenced Edward McAlanis, Crim. No. 21-516 (DLF) to a two year term of probation, who like Mr. Spain was inside the U.S. Capitol for about 15 minutes. Lastly, this Court sentenced Esther Schwemmer, Crim. No. 21-364 (DLF) to a two year term of probation. Ms. Schwemmer was also inside the U.S. Capitol for 15 minutes, was cooperative with law enforcement, and admitted her conduct to law enforcement. Notably, this Court in *United States v. Douglas Wangler and Bruce Harrison*, Crim. No. 21-365 (DLF) sentenced both defendants to a two year term of probation. Interestingly, and importantly, both of those defendants were made plea offers that included the government's agreement to allocute for a sentence of probation. *See* ECF #32 & #33, Crim. No. 21-365 (DLF).  Also,  all of the cases cited above whereby this Court sentenced those individuals to probation do not involve any violence. What makes Mr. Spain's case different is he seems to be the only person that was told,

22

albeit incorrectly, that he had to appear in person for his initial appearance. That in and of itself is a form of punishment already meted out not by the Court, but by the system.

Mr. Spain was far more cooperative with law enforcement than many of these other defendants, did not attempt to hide any evidence, in fact produced evidence when asked and has not publicly blamed another group for the violence that day. All told, the facts of the offense conduct and characteristics of the defendants who garnered incarceration were starkly different than Mr. Spain's conduct and characteristics. Mr. Spain's actions fall on the low-end of the spectrum that day and his culpability appears to be minimal in contrast with rioters who destroyed or stole government property and assaulted or threatened the law enforcement officers on that date.

## IV. CONCLUSION

Considering all the applicable factors the Court will consider, Mr. Spain respectfully moves this court to impose a sentence of 12 months probation. This sentence is "sufficient but not greater than necessary" as required by 18 U.S.C. §3553(a). It would be a sentence in the best tradition of federal judicial discretion, that would consider Mr. Spain as an individual and account for his unique failings and positive attributes that, in the words of Justice Kennedy "sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Rita v. United States*,

551 U.S. at 364, (Stevens, J. concurring), *citing Koon v. United States*, 116 S.Ct.

2053 (1996).

Respectfully submitted,


By:      /s/

KIRA ANNE WEST
DC Bar No. 993523
712 H. St NE, Unit #509
Washington, D.C. 20005
Phone: 202-236-2042
kiraannewest@gmail.com


CERTIFICATE OF SERVICE

I hereby certify on the 21st  day of April, 2022 a copy of same was delivered

to the parties of record, by ECF  pursuant to the Covid standing order and the  rules

of the Clerk of Court.

                                   /S/
Kira Anne West